■ HAROLD DERDIARIAN et al., Respondents, v FELIX CONTRACTING CORP., Appellant-Respondent, and CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Respondent-Appellant, et al., Defendants. (And a Third-Party Action.) —In a negligence action to recover damages for personal injuries, etc., defendants Felix Contracting Corp. and Consolidated Edison Company of New York separately appeal from stated portions of an interlocutory judgment of the Supreme Court, Queens County, entered January 13, 1978, which, *inter alia,* is in favor of plaintiffs and against said defendants, upon a jury verdict after a trial limited to the issue of liability only. Defendant Felix Contracting Corp., also appeals from an order of the same court, dated December 13, 1977, which granted plaintiffs' motion to increase the *ad damnum* clause from $2,000,000 to $3,300,000. Interlocutory judgment affirmed insofar as appealed from and order affirmed, with one bill of costs payable jointly by appellants. The 48-year-old plaintiff husband (hereafter plaintiff) was seriously injured at a work site in Mount Vernon when his face, head and body were splattered and set aflame by a kettle of hot (400 degree) tar which was struck by an automobile driven by defendant James Dickens that was out of control. Dickens had sustained an epileptic seizure

and blacked out. Plaintiff was employed as a foreman by Bayside Pipe Coaters; a subcontractor engaged by the general contractor Felix Contracting Corp. (Felix), to seal a 20-inch high pressure gas main that was being installed underground in Mount Vernon pursuant to a contract between Felix and Consolidated Edison Company of New York (Con Edison). The accident occurred about 2:00 P.M. on November 21, 1973 on Oak Street when, according to plaintiff, he was walking from his truck, parked adjacent to the excavation, towards a restaurant on the southeast side of the street. Plaintiff testified that he had parked his one-ton Chevrolet pickup truck parallel to the curb, adjacent to the west side of the excavation, at the direction of Felix' foreman at the site. Consequently, the kettle of tar, which was heated by the torch head of a compression tank filled with kerosene, was set by plaintiff on wire milk baskets in line with the tailgate of the truck near the south curbline. Plaintiff said that he asked for the truck to be situated on the east side of the excavation. At the site of the accident, Oak Street runs east and west between North Bleeker (west) and North Bond Street (east). Oak Street is 30 feet wide and has two lanes of traffic, one in each direction. The excavation, some 12 feet measured north-south and 15 feet measured east-west, was located in the eastbound lane, about 70 feet east of Bleeker, a foot south of the center line of the street and about two feet from the curb. Felix argues that any finding of negligence was obviated as a matter of law by its proof that a workman had placed two barricades (A-frame "horses") along the west side of Oak Street at North Bleeker, blocking the eastbound lane, and six or seven barricades along the mid-line of Oak Street beside the hole and that, in addition, there was a flagman. Felix maintains that it had done everything necessary and customary to ensure safety for excavation work of this type at such a site. It contends that the out-of-control vehicle was an unforeseeable event and that the automobile could not have been prevented from entering the work area by any type of barrier nor protected against by any series of warnings by flagmen to workers. In our view, permitting the jury to determine the issue of Felix' negligence was not error. Given the hazards to men working in a hole near 400-degree tar, it was a question of fact—on which the experts differed—whether Felix' safety measures were so inadequate as to be negligent and whether such negligence was a substantial factor in bringing about the harm (see *Lopes v Adams,* 37 AD2d 610, affd 30 NY2d 499). Plaintiff's engineering expert testified that there is a difference between a barricade and a barrier and that good practice called for a barrier to be placed across the entire width of the excavation to protect workmen from out-of-control cars. A barrier, the expert said, is "a truck or a piece of heavy equipment which will stop a vehicle from penetrating the work zone * * * required when you have a special hazard." A barricade will not stop any vehicle but merely "channelize traffic or * * * outline the work zone". The expert also testified that two flagmen were necessary and that there should have been advance warning signs. Defendant Felix' expert engineer distinguished a barricade in the same way. He was of the opinion, however, that warning signs were not necessary, that a single flagman was adequate because the traffic signal served as a second flagman and that placement of two pieces of equipment to block Oak Street at the excavation site was not required practice. On one critical point, there was no disagreement. The one-ton Chevrolet pickup truck was available for use as a barrier across the eastbound lane if it had been parked in a north-south direction. Moreover, the expert testified that "If there happens to be a vehicle or a piece of equipment * * * available, it is prudent practice to make use of it in that

vein". Clearly, there were fact issues here which were most appropriate for a jury to decide. Felix also urges that the sections of the city's ordinances that were read to the jury were inapplicable and it was, therefore, prejudiced by the instructions. It argues that the requirement that the permittee "shall erect and maintain suitable barricades and fences around all of his work while excavation or other work is in progress and shall arrange his work [to cause minimum delay and inconvenience] to vehicular and pedestrian traffic" (Mount Vernon Building Code, Department of Public Works, § 38-24) is designed for pedestrian protection and the flow of traffic. Felix relies on *Sarconi v 122 W. 26th St. Corp.* (241 NY 340), where it was held that it was prejudicial error to let the jury consider a rule respecting the operation of a *passenger* elevator where the plaintiff was injured in a *freight* elevator. The ordinance requiring the erection and maintenance of suitable barricades did not, however, demand any more of defendant Felix than it was already obligated to do, whereas in *Sarconi* the requirement for the two types of elevators were very different. Felix did not suggest, after all, that it was not required to put up *any* barricades or that those it had put up were not "suitable". The other contentions may be dealt with summarily. In order for Felix to prevail with respect to its contention that the indemnification clause in its contract with Con Edison does not apply to the present situation, Felix must show that it is free of negligence (see *Carollo v Consolidated Edison Co. of N. Y.,* 57 AD2d 853). As discussed earlier, this Felix is unable to do. The question of plaintiff's contributory negligence was clearly a question to be determined by the jury. An increase in the *ad damnum* clause from $2,000,000 to $3,300,000 upon a re-evaluation of injuries incurred as a result of facts already known to the defendants was not improper in the circumstances (see *Wagner v Huntington Hosp.,* 65 AD2d 771). Lazer, J. P., Gulotta and Margett, JJ., concur.

Cohalan, J., dissents and votes to reverse the judgment insofar as appealed from and to dismiss the complaint as against defendants Felix Contracting Corp. and Consolidated Edison Company of New York, and to dismiss the appeal from the order as academic, with the following memorandum: On the issues of negligence, foreseeability and proximate cause, I would reverse the interlocutory liability judgment against defendants Felix and Con Ed and dismiss the complaint as against them, as a matter of law. Except as noted hereafter, I adopt the fact situation as outlined in the majority memorandum. The fact pattern as developed by the testimony was more bizarre than that in *Palsgraf v Long Is. R. R. Co.* (248 NY 339). As there noted (p 344), "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension". From the picture before us it is difficult to imagine how the manner of this subject accident could have been within the range of apprehension. As well might we look for a helicopter to pancake on the kettle and scatter its contents as to foresee what did actually happen. By its verdict the jury found that Felix should have foreseen the general chain of events as follows: That—1. Plaintiff would not actually be working at the moment of the accident; and 2. If plaintiff had been working he would have seen the oncoming car as did the witness, Soares; and 3.* The tar kettle would be placed quite close to the sidewalk; and 4.* The tar kettle would be heated to 400 degrees Fahrenheit; and 5.* The tar kettle would be unattended at the moment of impact; and 6. James Dickens was an epileptic and knew that he was because he had blacked out on prior occasions, and

---

* No one ordered Derdiarian to place the kettle where he positioned it.

was taking medication for his condition; and 7. Despite his infirmity, Dickens would be driving an automobile; and 8. Dickens knew of the work going forward and had successfully negotiated a westward passage through the construction site earlier in the day, and apparently thought he could return without mishap; and 9. Dickens would black out in the immediate vicinity of the construction area; and 10. When Dickens blacked out, the flagman should somehow have stopped the Dickens' car, wherever it was at the moment; and 11. Dickens would completely lose control of his car; and 12. The Dickens' car, out of control, would knock down the western barricades and proceed in an easterly direction partly on the sidewalk area; and 13.* The Dickens' car would strike the tar kettle; and 14.* The contents of the kettle would splatter over and injure plaintiff, even though Soares, plaintiff's fellow employee, escaped unscathed from the scene. I am aware that "The exact occurrence or precise injury need not have been foreseeable; but the results of a negligent act must be not merely possible but probable" (1 PJI 2:12). However, in the light of the chain of events above established, this was merely an unforeseen and unforeseeable freak accident. The odds against such a happening are astronomical. By parity of reasoning, the fact that the accident did happen does not, in and of itself, establish that it was foreseeable. *Ventricelli v Kinney System Rent A Car* (45 NY2d 950), a case recently decided on the question of foreseeability, is in point. The facts in *Ventricelli* are simple. Plaintiff had rented an automobile with a defective trunk lid. He went to repeated efforts to keep it closed. While he was doing so on one occasion he was struck from behind. As the court noted (p 952): "That Kinney's negligence in providing an automobile with a defective trunk lid would result in plaintiff's repeated attempts to close the lid was reasonably foreseeable. Not 'foreseeable', however, was the collision between vehicles both parked a brief interval before the accident. Plaintiff was standing in a relatively 'safe' place, a parking space, not in an actively traveled lane. He might well have been there independent of any negligence of Kinney, as, for example, if he were loading or unloading the trunk. Under these circumstances, to hold the accident a foreseeable consequence of Kinney's negligence is to stretch the concept of foreseeability beyond acceptable limits (see Prosser, Law of Torts [4th ed], pp 267-270; Restatement, Torts 2d, § 435, subd 2)." Assuming, *arguendo*, that Felix was negligent in the physical set up at and near the excavation, "to hold the accident a foreseeable consequence" of Felix' negligence "is to stretch the concept of foreseeability beyond acceptable limits". Derdiarian equates the physical circumstances of *Lopes v Adams* (37 AD2d 610, affd 30 NY2d 499) with those in the instant action. *Lopes*, however, is distinguishable on its own facts. The locale of the *Lopes* case was Van Wyck Expressway, a six-lane express highway. The lane in which the plaintiff was working was completely unprotected—no barrier—no barricades—no anything. As against this we have Oak Street in Mount Vernon—a secondary, 30-foot-wide highway—barricaded to warn persons on the street—a flagman waving a red flag and an excavation some 70 feet east from the barricades. The defendant in *Lopes* may have had an ill-functioning steering mechanism, but there is no mention of any brake malfunction—nor is there anything to indicate that the driver lost consciousness before the happening of the episode. Derdiarian's testimony is suspect in more than one respect. His implication that he heard the screeching of brakes does not square with the facts. By that time Dickens had already blacked out; and the erratic course of his car is proof positive that he had lost control of it. Moreover, the circumstance that plaintiff had been "ordered" to park his truck west of the

excavation because time was running out, borders on the incredible. From 11:30 A.M. when Derdiarian arrived on the scene until about 1:30 or 2:00 P.M. when the accident occurred, not one lick of work was done by him in the excavation. During this period plaintiff was lunching at the firehouse and fraternizing with the houseman. He had plenty of time and opportunity, if so minded, to move the truck to any position he desired. Therefore, his statement appears to be made out of whole cloth, and perhaps tailored for the occasion. Even if we accept as a fact that he was told to park his truck in a certain place nothing was said about the kettle. Three witnesses— Soares, Miller the flagman and Mrs. Cortazzo the school crossing guard—all placed the kettle only two feet from the southwest corner of the hole before the accident. When we consider how small the excavation was—12 feet by 15 feet—he could easily have moved the kettle to a position east of and adjacent to the hole and on a line with his truck without causing himself or his helper the slightest inconvenience. Had he done so he would not have been burned. Certainly the plates which covered the opening during non-working hours would not have presented a problem. As a matter of law and more to the point in the circumstances of this case is the statement that: "This court has consistently held that the negligence complained of must have caused the occurrence of the accident from which the injuries flow" (Rivera v City of New York, 11 NY2d 856, 857). There a child was severely burned when he fell into a bathtub full of hot water while standing on its edge trying to reach a light cord. In reversing a judgment for the plaintiff and dismissing the complaint, the court went on to note (p 857) that "The hot water created the specific injuries for which damages were sought * * * but it did not cause the intervening act which was not foreseeable." The accident was caused by the slipping of a wet boot while the child balanced on the curved edge of the bathtub. Surely, at bar, where Felix had nothing whatever to do with the placement of the kettle and could not have dreamed that Dickens would appear out of the blue as he did, it (Felix) did not cause the "intervening act which was not foreseeable" and hence should not have been held responsible to Derdiarian. On the issue of proximate cause which in this case is closely allied to foreseeability, I return to Ventricelli where the terms are used almost interchangeably (45 NY2d 950, 951-952, supra): "Proximate cause and foreseeability are relative terms, 'nothing more than a convenient formula for disposing of the case' (Prosser, Law of Torts [4th ed], § 43, p 267). In writing of the 'orbit of the duty' Chief Judge Cardozo said '[t]he range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury' (Palsgraf v Long Is. R. R. Co., 248 NY 339, 345). So it is with proximate cause and foreseeability". Here, then, the proximate cause was the advent of Dickens with his car and his epileptic seizure. The intervening cause was the placement of the kettle and Derdiarian's proximity to it. At best—or worst—the role of Felix was similar to that of Kinney in Ventricelli, and was not the proximate cause of the freakish accident that occurred (see Martinez v Lazaroff, 66 AD2d 874).